## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

JOYCE MILLMAN, )
)
               Plaintiff, ) No. 04 C 8231
)
        v. ) Magistrate Judge
) Arlander Keys
JO ANNE B. BARNHART, )
Commissioner of Social Security, )
)
            Defendant. )

### MEMORANDUM OPINION AND ORDER

Plaintiff, Joyce Millman, moves this Court for Summary
Judgment pursuant to Rule 56(a) of the Federal Rules of Civil
Procedure, to reverse or remand the final decision of the
Commissioner of Social Security (the "Commissioner"), which
denied her claim for Disability Insurance Benefits ("DIB".) 42
U.S.C. § 405(g) (2003.) Defendant has filed a Cross-Motion for
Summary Judgment, asking this Court to affirm the Commissioner's
final decision. For the reasons set forth below, the Court
affirms the Commissioner's decision.

### Procedural History

Plaintiff protectively filed for DIB on December 28, 2001 at
the age of 61. (R. at. 51-54.) Plaintiff claims that, following
a car accident in August of 1998, she began losing cognitive
abilities and experiencing speech difficulties. (R. at 122.)

Due to these impairments, Plaintiff claims that, as of December 27, 2001, she was unable to work in her previous job. (R. at 14.) Plaintiff's initial DIB request was denied on January 31, 2002. She filed a timely Request for Reconsideration, which was denied on May 8, 2002. (R. at 23-25, 30.) On July 10, 2002, Plaintiff requested a hearing, which was held on November 21, 2002, in Evanston, Illinois before Administrative Law Judge ("ALJ") Cynthia Bretthauer. (R. at 39-42.) At the hearing, Vocational Expert ("VE") Frank Mendrick testified. (R. at 13.) In a decision dated June 23, 2003, the ALJ denied Plaintiff's application and found Plaintiff not disabled. (R. at 13-22.)

The Appeals Council denied review on October 22, 2004. (R. at 5-7.) Because the Appeals Council found no basis for further review, the ALJ's findings constitute the final decision of the Commissioner. *See* 20 C.F.R. § 416.1481.

## Statement of Facts

I. Summary of the Facts

Plaintiff, Joyce Millman, was born on May 7, 1940, and has a Master's Degree in Communications and Drama from Northwestern University. Plaintiff was previously employed at the Northern Illinois Council on Alcoholism and Substance Abuse (NICASA) as a substance abuse preventionist, since November 1986. (R. at 122, 78-82.) Plaintiff most recently worked as the Director of Parent Services at NICASA until she retired on December 27, 2001, due to

2

a cognitive disorder and language difficulties. (R. at 78, 14.)
Plaintiff is married to Harvey Millman and has one adult son from
this marriage. (R. at 116.) She suffers from a cognitive
disorder causing language difficulties. (R. at 121.)

II. Testimony at the November 21, 2002 Hearing

At the Administrative Hearing held on November 21, 2002, the
ALJ heard testimony from Plaintiff, Harvey Millman, and VE
Mendrick.

A. Plaintiff's Testimony

Plaintiff testified to having headaches of unknown onset
once a week, for which she takes one or two hour naps to
alleviate. (R. at 215.) Plaintiff does not treat her headaches
with any medication, and has not discussed them with her doctor.
(R. at 214-15.) Plaintiff also testified that she gets dizzy
while on the stairs and must hold onto the railing, approximately
once each week. (R. at 215-16.) However, she has never fallen
down because of this dizziness. (R. at 216.) Plaintiff
specifically testified that she did not get dizzy when she
recently drove a group of friends to Milwaukee. (R. at 216.)
Other than these conditions, Plaintiff testified that she has no
trouble walking, standing or sitting. (R. at. 217.)

Plaintiff testified that, every morning, she walks one mile
with a friend. (R. at 217.) After walking, she has breakfast,
does the laundry, and goes grocery shopping. (R. at 218.)

3

Plaintiff testified that she relies on a list when grocery shopping, but that she is able to lift the shopping bags without assistance. (R. at 217-18.) Plaintiff cooks lunch and dinner, does the dishes, and does most of the cleaning around the house. (R. at 218.) She is able to bathe and dress herself. (R. at 218.) Plaintiff testified that she has a current driver's license, and continues to drive herself to the grocery store and on other errands. (R. at. 205.)

In addition to her morning walk, Plaintiff also practices Tai-Chi at home and takes an exercise class once a week. (R. at 218-19.) However, she testified that since her car accident, she has had some difficulty balancing while practicing Tai-Chi. (R. at 223.) Plaintiff testified that she enjoys solving easy crossword puzzles and reading magazines and books. (R. at 219.) However, she must reread the material she reads and cannot remember what she has read once she has finished. (R. at 219-20.) Plaintiff testified that, in the past year, she went on a thirteen-day cruise to Juno, Seattle, Vancouver and Toronto with her husband. (R. at 220-21.) She also testified that she flew alone to California to visit her mother for four days. (R. at 21.)

Additionally, Plaintiff testified to suffering from mild depression. (R. at 211.) Plaintiff testified that, because of her cognitive and language difficulties, she has trouble

4

communicating with her husband and her marriage has suffered.
(R. at 213.)  To treat her depression, Plaintiff testified that
she currently participates in a peer counseling program.  (R. at
211.)  Plaintiff testified that she is not taking any medication
or actively seeking a counselor or therapist for her depression.
(R. at. 212.)  While there is no medication for her condition,
Plaintiff testified that she has been receiving speech therapy.
(R. at 210.)

Several times throughout her examination, Plaintiff had
noticeable difficulty understanding and answering the ALJ's
questions.  (R. at 206, 211, 223.)  For example, Plaintiff
confused yes and no when attempting to answer a question from the
ALJ, and, in response to a later question, Plaintiff claimed that
she could not "find words."  (R. at 211, 223.)  At one point,
Plaintiff's husband added that one of the symptoms of Plaintiff's
condition is that yes and no are frequently interchanged.  (R. at
211.)  Additionally, when asked to do so by the ALJ, Plaintiff
was unable to explain why she could not perform a simple,
unskilled job such as a cleaner.  (R. at 206-09.)[1]  The ALJ even

[1] The dialogue between the ALJ and Plaintiff concerning this
question best illustrates Plaintiff's inability to answer:

ALJ: . . . [W]hat I have to look at is given your condition --
your medication condition [sic] now, is there any job in this
country that you can do.
Plaintiff: No.
ALJ: Okay. Now the question then is why not?  Why couldn't you do
a very simple, unskilled job that would be like assembly or
packing, things like that?

5

noted that "[c]ommunication is obviously the worst symptom of [Plaintiff's] condition." (R. at 213.)

B. Harvey Millman's Testimony

When asked whether he had ever noticed Plaintiff displaying either poor judgment or impulsivity, Mr. Millman testified that, while still working at NICASA, Plaintiff had once failed to notify her supervisor of a meeting, which put her agency in potential legal trouble. (R. at 222.) When questioned as to whether Plaintiff had ever put herself in harms way, Mr. Millman described an incident where he had to pull Plaintiff out of the path of a moving car, because she was not watching the roadway. (R. at 222.) He testified that, while he feels uncomfortable with Plaintiff being alone in situations where this kind of

---

Plaintiff: No.
ALJ: Why can't you do that?
Plaintiff: Ask me a question again.
ALJ: Okay. I want to know why you couldn't do a job like that. This is a job that wouldn't require any talking. You would be sitting at a -- you know, someplace, maybe just packing or inspecting even products. You wouldn't have to do any talking. Why couldn't you do that kind of a job?
Plaintiff: Well, the supervisor was communicating with me and it's not my job.

Then later on in the hearing:
ALJ: ...[B]ut I want to know why you can't to the job. You tell me why in your opinion you could not do a job say as a janitor.
Plaintiff: [no audible response]
ALJ: Do you understand what I'm asking?
Plaintiff: Yes.
ALJ: Okay. If you could just describe for me what would prevent you from being able to do that job.
Plaintiff: I'm 62 --
ALJ: Okay.

6

danger could exist, he is hesitant to restrict her activities, because she has not yet been injured. (R. at 222-23.)

C. Vocational Expert Frank Mendrick's Testimony

With respect to Plaintiff's past work, VE Mendrick testified that Plaintiff has worked in four positions, all involving substance abuse, in which she was listed as a counselor or director of programs. (R. at 225.) He testified that, according to the Dictionary of Occupational Titles ("DOT"), a general counseling position is skilled work and is universally done at the sedentary level, even though Plaintiff did some light work. (R. at 225.) The VE also testified that Plaintiff did some educational work, where she lifted and carried items in excess of ten pounds. Id.

The ALJ presented the VE with a hypothetical individual who is 62 years old, has the same work experience and education of the Plaintiff, and has no exertional limitations, but limited the individual to jobs that are "simple, repetitive and routine, jobs where there is no regular general public contact, jobs where the person would not be required to communicate," and jobs "where the person must avoid even moderate exposure to activities involving unprotected heights or being around moving and hazardous machinery." (R. at 225.) The ALJ further assumed that this person could not perform Plaintiff's past work. (R. at 225-26.) When questioned as to examples of jobs that such a hypothetical

person could perform, the VE testified that jobs such as a cleaner/sweeper, hand-packer, and assembler, as listed in the DOT, would be available to this individual. (R. at. 226.)

VE Mendrick testified that a cleaner/sweeper, which is listed under janitorial services, is medium, unskilled work and has the fewest educational development requirements. (R. at 226.) He further testified that there are 10,000 such jobs in the six-county Chicago metropolitan area and Porter and Lake Counties in Indiana. (R. at 226.) With respect to the hand-packer job, the VE testified that, in any industry, such a position is medium, unskilled work and has almost the lowest educational development rating. (R. at 226.) The VE testified that, within the geographical area described above, there are approximately 10,000 such hand-packer jobs. (R. at 226.) Finally, with respect to an assembly job, in the toy and sports equipment industry, VE Mendrick testified that such a job is medium, unskilled work, with almost the lowest educational development rating. (R. at 226.) He added that this job requires "common sense to follow instructions." (R. at 226.) The VE testified that there are 2,000 such positions in the region. (R. at 226.) The VE added that there are a total of 600,000 unskilled, medium jobs in the area. (R. at 227.)

When the ALJ added that the hypothetical individual was unable to remember instructions on a day to day basis, the VE

testified that being able to remember and carry out instructions are "essential" and "basic mental requirement[s]" of the jobs he had described. (R. at 227.) He further testified that, in all three of these positions, an employee would have some interaction with a supervisor. (R. at 227.) In addition, the VE testified that it is usually a senior worker who would instruct and orient a new employee and communicate any changes in job responsibility or daily routine. (R. at 228-29.)

III. Medical Evidence

In addition to the testimony given by Plaintiff, Mr. Millman, and VE Mendrick, the ALJ considered medical records documenting Plaintiff's impairments.

a. Dr. Michael J. Di Domenico

Dr. Michael J. Di Domenico, a licensed clinical psychologist, evaluated Plaintiff on March 13 and 19, 2001. (R. at 115.) The purpose of these neuropsychological evaluations was to investigate cognitive changes experienced in the past year and to determine if they were due to dementia and/or emotional difficulties. (R. at 115.) For both examinations, Plaintiff arrived in a timely fashion, was neatly dressed and groomed, and was cooperative throughout the evaluation process. (R. at 117.) At the time of these evaluations, Plaintiff reported having difficulty with word finding, completing thoughts and sentences, verbal comprehension, and efficient decision making. (R. at

116.) Plaintiff also reported memory troubles and that she needed to keep a memory or appointment book to remember important dates and information. (R. at 116.)

Overall, Dr. Di Domenico found that, on most tasks, Plaintiff functioned within normal cognitive limits and that her thought processes were "logical, sequential and coherent." (R. at 117.) However, instructions occasionally needed to be repeated or simplified and, at times, Plaintiff had noticeable word-finding difficulties. (R. at 117.) The psychologist also noted a decline in "verbal abstract reasoning abilities, practical judgment and common-sense type of reasoning," which, he opined, might cause Plaintiff some difficulty in "making an appropriate decision in novel situations." (R. at 117.) At times, Plaintiff had difficulty remaining focused on the task at hand and seemed to have difficulty with tasks of sustained attention and concentration. (R. at 118.) The psychologist noted that Plaintiff's language skills appeared fluent, but that she demonstrated significant pauses on a timed test of verbal fluency. (R. at 119.) Plaintiff also demonstrated difficulty with simple writing tasks. (R. at 119.) Dr. Di Domenico opined that comprehension is the major problem affecting Plaintiff's job performance. (R. at 120)

A higher cognitive functioning evaluation revealed that Plaintiff had "significant difficulty with verbal abstract

reasoning and concept formation." (R. at 119.) Dr. Di Domenico also noted some compromise in Plaintiff's problem solving, mental flexibility, and anticipatory planning abilities. (R. at 119-20.) Plaintiff had great difficulty categorizing like stimuli, and was unable to give abstract meanings to simple proverbs. (R. at 119.) With respect to her behavior, the psychologist noted that Plaintiff presented as "silly with social disinhibition, poor judgment, impulsivity and difficulty with sustained attention." (R. at 120.) While Plaintiff did not exhibit any serious emotional difficulties, she was very concerned about her changes in cognition and reported some marital difficulties. (R. at 119.) The psychologist also noted that Plaintiff appears to be suffering from low self-esteem. (R. at 120.)

Dr. Di Domenico concluded that Plaintiff's symptoms were consistent with a mild dementia secondary to an infarct in the Basal Ganglia, and offered a diagnosis of a cognitive disorder causing language difficulties. (R. at 120.) He opined that Plaintiff would have difficulty maintaining a job that required superior language abilities, including public speaking, and suggested that Plaintiff consider applying for some form of disability. (R. at 120.) He recommended that Plaintiff use a memory book to record important dates and information, and stay involved in social activities with her peers "for stimulation and support." (R. at 121.)

b. Dr. Judith A. Holmes

Dr. Judith A. Holmes, a licensed psychologist, evaluated Plaintiff on September 24, 2001. (R. at 122.) This neuropsychological evaluation was conducted to investigate Plaintiff's current level of cognitive functioning. (R. at 123.) Plaintiff reported that she had experienced problems with word finding, short term memory, decision making and reading comprehension, beginning in the Fall of 1998 (R. at 122.) Plaintiff also reported that she had experienced symptoms of depression due to her marital problems and functional limitations. (R. at 122.)

Behavioral observations revealed that Plaintiff became frustrated when confronted with challenging tasks, often sighing and physically shuddering. (R. at 123.) Psychological functioning examination revealed symptoms of "depression and anxiety characterized by feelings of sadness, discouragement, self blame, fatigue, tension and worry in reaction to [Plaintiff's] current situational stress." (R. at 124.) Dr. Holmes noted that these symptoms appeared to be a reaction to Plaintiff's current situation. (R. at 124.) While Plaintiff appeared anxious during the evaluation, she was "fully alert and adequately attentive." (R. at 123.)

Overall, Plaintiff functioned at an average level of intelligence, but Dr. Holmes noted that the significant

discrepancy between her Verbal (88, low average) and Performance (116, high average) IQ's indicated a decline in verbal abilities. (R. at 123.) Testing indicated deficits in information processing, verbal fluency, flexible thinking, and abstract reasoning. (R. at 124.) In fact, on a measure of logical analysis and abstract reasoning, Plaintiff's responses placed her in the low average range. (R. at 124.) Plaintiff's ability to concentrate and process information was in the low average range on the WMS-III measure of memory. (R. at 123.) The evaluation indicated evidence of a deterioration in verbal abilities and "deficits in information processing, verbal fluency, flexible thinking and abstract reasoning." (R. at 124.) Plaintiff's most pronounced symptom was anomic aphasia. (R. at 124.) Dr. Holmes noted a clear decline in several areas of functioning as compared to the March 2001 tests, indicating that Plaintiff's disorder was progressive and that increased difficulty was expected over time. (R. at 124-25.)

Dr. Holmes concluded that, while the etiology of Plaintiff's condition was unknown, it could have been "due to a cerebrovascular event, demyelinating disease or may [have represented] a primary progressive aphasia." (R. at 124.) The psychologist opined that Plaintiff's psychological symptoms were not the cause of her underlying cognitive disorder. (R. at 124.) Dr. Holmes made several recommendations to help Plaintiff

compensate for her disabling condition. (R. at 125.) Because Plaintiff may have difficulty focusing or attending to multiple tasks, she recommended that Plaintiff keep distractions to a minimum and focus on only one task at a time. (R. at 125.) Dr. Holmes also noted that Plaintiff may have trouble tracking information changes from day to day and should "rely on notes, lists, calendars and audio reminders." (R. at 125.) Additionally, Plaintiff exhibited a reduced ability to think flexibly and abstractly, and did not generate alternative approaches to problems, tasks or situations. (R. at 125.) Dr. Holmes opined that these difficulties might hinder Plaintiff's problem solving abilities, "interfere with adequate planning and organization[,] and create inefficiency in handling complex activities." (R. at 125.) Dr. Holmes further noted that, while Plaintiff could "perform well-routinized activities she [was] less able to concentrate [and] manage multiple details." *Id.*

In response to the entirety of Plaintiff's symptoms, Dr. Holmes recommended that Plaintiff apply for disability benefits. (R. at 125.) Furthermore, Dr. Holmes opined that the nature of Plaintiff's current cognitive treatment is not likely to be effective. (R. at 125.) Dr. Holmes recommended that Plaintiff work with a psychologist familiar with neuropsychological as well as mood disorders. (R. at 125.) Lastly, Dr. Holmes suggested

that Plaintiff be reevaluated in the next 12 months. (R. at 125.)

c. Dr. M. Marsel Mesulam

Dr. M. Marsel Mesulam, a specialist in neurology and psychiatry and the Director of the Northwestern Neurobehavior and Memory Health Services, evaluated Plaintiff on December 11, 2001. (R. at 130.) Plaintiff told Dr. Mesulam that she had been in a motor vehicle accident in the fall of 1998, and that she first experienced her symptoms three to fours weeks thereafter. (R. at 130.) Plaintiff reported that, since the accident, she has had "considerable difficulty finding words during speech as well as writing," has used poor written grammar, and has experienced slowed reading. (R. at 130.) While Plaintiff reported that she planned to voluntarily retire from her job at NICASA that year due to the progression of these difficulties, her daily living activities remained unchanged and she enjoyed solving crossword puzzles. (R. at 130.) Dr. Mesulam felt that Plaintiff was adequately concerned about her condition. (R. at 130.)

His examination revealed depressed fluency in writing and speech, but no language repetition difficulty, good naming, and excellent comprehension, except for grammatically complex sentences with passive voice construction. (R. at 131.) While Plaintiff's writing tended to be telegraphic, she made no spelling errors. (R. at 131.) During this visit, Dr. Mesulam

15

also examined Plaintiff's March 2001 MRI scan and found minimal atrophy, with slightly more in the left perisylvian region and T2 hyperintensity in the left subinsular area. (R. at 130.) He opined that the small size of this atrophy was insufficient to explain her current symptoms or their progression, even though it was located within the language network. (R. at 130.) Furthermore, Dr. Mesulam suggested that her condition was unrelated to her accident, because Plaintiff remained symptom free for several weeks following the accident. (R. at 130.) Because of the insidious onset and progression of Plaintiff's condition, Dr. Mesulam diagnosed Plaintiff with idiopathic primary progressive aphasia and ordered another MRI and PET scan. (R. at 131.)

A cerebral PET imaging on December 17, 2001 revealed a "mild degree of diffusely decreased metabolism" and a milder degree of hypometabolism in the left temporal lobe as compared to the right, which correspond to areas of asymmetrical atrophy found in the MRI of December 19, 2001. (R. at 167.) The report noted that the distribution of findings "is not typical of Alzheimer's disease or Pick's disease." (R. at 167.) However, the findings may account for Plaintiff's symptoms of memory loss and aphasia. (R. at 167.) The brain MRI without contrast performed on December 19, 2001, found diffuse cerebral volume loss with the frontal lobe and left temporal lobe most affected. (R. at 169)

16

In a February 26, 2002 examination performed by Dr. Mesulam, Plaintiff exhibited difficulty with oral expression and comprehension, slow reading, and word finding difficulties. (R. at 178.) While Plaintiff's writing was agrammatic, it conveyed meaning well. (R. at 178.) Further examination revealed continued "non-fluent aphasia with word finding pauses and occasional simplifications." (R. at 178.) Plaintiff understood conversational speech and grammatically complex sentences. (R. at 178.) Plaintiff had no difficulty with repetition and '[n]aming was only mildly impaired especially for man made objects." (R. at 178.) While Plaintiff reported that she retired in December of 2001 due to her language difficulties, her daily living activities, including household chores, driving, balancing her checkbook, and socializing, remained intact. (R. at 178.) Plaintiff also disclosed that she was caring for a friend who had an injured shoulder. (R. at 178.) According to her husband, Plaintiff was "occasionally dejected and frustrated, but [did] not show any change in personality or temperament." (R. at 178.) Conclusively, Dr. Mesulam confirmed his earlier diagnosis of primary progressive aphasia (PPA) and ordered a neuropsychological evaluation "to assess strengths and weaknesses." (R. at 179.) Additionally, Dr. Mesulam noted the present lack of specific medications for PPA. *Id.*

On July 23, 2002, Dr. Mesulam examined Plaintiff, noting that she continued to have "a mild non-fluent aphasia with decreased speech output and word finding hesitations but no paraphasias." (R. at 180-81.) While naming was "quite good," Plaintiff again "displayed difficulties comprehending grammatically complex sentences with passive voice and possessives." For example, Dr. Mesulam noted that Plaintiff could not distinguish between "my mother's uncle" and "the mother of my uncle." (R. at 181.) Again, Dr. Mesulam affirmed his diagnosis of "a non-fluent and mild form of primary progressive aphasia." (R. at 181.) In Dr. Mesulam's last correspondence, dated October 23, 2002, he opined that Plaintiff was "not able to sustain competitive employment on a full time basis," because she suffers from "[a]phasia as described in [his] clinical reports." (R. at 177.)

d. Dr. Campbell

On January 18, 2002, Plaintiff's primary physician, Dr. Campbell, prepared both a psychiatric and a neurological report. (R. at 135-139.) In these reports, Dr. Campbell noted that Plaintiff suffered from word finding and communication problems. (R. at 135.) In response to questions concerning Plaintiff's level of daily functioning, Dr. Campbell noted that Plaintiff was able to function independently, enjoyed working on crossword puzzles, and visits her son and grandchild regularly. (R. at

135-36.) Additionally, Dr. Campbell remarked that Plaintiff retained normal thought process and that she was "capable of understanding and following orders." (R. at 136-37.)

e. Disability Determination

On January 30, 2002, after reviewing Plaintiff's record, state agency psychologists prepared a Disability Determination. The SSA consulting physicians found that Plaintiff suffered from idiopathic primary progressive aphasia, but noted that her disorder does not precisely satisfy the psychological or behavioral diagnostic criteria for an Organic Mental Disorder. (R. at 140-41.) When assessing Plaintiff's functional limitations, the psychologists found that Plaintiff had mild restriction of her daily activities, and moderate difficulties in maintaining social functioning and in maintaining concentration, persistence, or pace. (R. at 150.) The report also reflects that the evidence of Plaintiff's disorder did not establish the presence of the "C" criteria. (R. at 151.)

A Capacity Assessment was prepared on January 30, 2002 by the state agency psychologists. In assessing Plaintiff's understanding and memory, the psychologists noted that Plaintiff's ability to remember locations and work-like procedures, and her ability to understand and remember very short and simple instructions was "not significantly limited." (R. at 154.) Plaintiff's ability to understand and remember detailed

instructions was "moderately limited." (R. at 154.)
Additionally, Plaintiff was "not significantly limited" in ten
areas of sustained concentration and persistence, including her
ability to carry out very short and simple instructions, and only
found her "moderately limited" in her ability to carry out
detailed instructions. (R. at 154.) Plaintiff was not
significantly limited in any areas of social interaction or
adaptation, and she had "the mental capacity to perform simple
tasks." (R. at 155-56.)

On the same day, the state agency psychologists completed a
Functional Capacity Assessment. After reviewing the entire
record, the consulting physicians found that Plaintiff had no
exertional limitations, no postural limitations, no manipulative
limitations, and no visual limitations. (R. at 159-61.) The
physicians noted that Plaintiff has word-finding difficulties and
that she was diagnosed with idiopathic progressive aphasia. (R.
at 162.) Lastly, the physicians found that Plaintiff had no
environmental limitations except that she should "avoid work
areas requiring prompt speech for performance and/or safety."
(R. at 162.)

f. Dr. Nancy Johnson

On March 28, 2002, Dr. Nancy Johnson, of the Clinical
Neuropsychology Service at the Cognitive Neurology and
Alzheimer's Disease Center, examined Plaintiff at Dr. Mesulam's

recommendation. (R. at. 172.) Dr. Johnson's overall impression was one of "progressive language impairment in the context of an overall above average level of general intellectual functioning." (R. at 175.) In light of Plaintiff's educational and employment background, her performance on verbally based tests of attention was below expectation. (R. at 174.) Oral language examinations revealed non-fluent speech with reduced utterance length and frequent word-finding pauses, mild difficulties in comprehension for grammatically complex information, and moderate difficulties in reading comprehension. (R. at 174.) Plaintiff's written responses were slightly better, but Dr. Johnson nonetheless noted mild difficulties in comprehension of complex information. (R. at 174.) Plaintiff displayed no difficulties in object recognition or identification and performed very well on learning and memory tests. (R. at 174.) Additionally, examinations indicated that "basic attentional skills, visuospatial skills, anterograde memory, executive functions and comportment, were all generally preserved." (R. at 175.)

Dr. Johnson also noted that Plaintiff was experiencing a mild level of depressive symptoms. (R. at 175.) On a self-reported mood questionnaire, Plaintiff scored within the non-depressed range, but reported feelings of worthlessness and increased tearfulness. (R. at 174.) Plaintiff's husband also felt that she was demonstrating symptoms of mild depression and

anxiety in daily living activities. (R. at 174.)  In conclusion,
Dr. Johnson noted that Plaintiff's neurocognitive profile was
consistent with the previous diagnosis of PPA.  (R. at 175.)
Because Plaintiff had many areas of preserved cognitive
functioning, Dr. Johnson recommended that Plaintiff consider
participating in some type of activity involving social
interactions, such as volunteering in the community.  (R. at
175.)

g. Northwestern University Speech and Language Clinic

On April 3, 2002, Plaintiff underwent a speech and language
evaluation at the Northwestern University Speech and Language
Clinic.  (R. at 182.)  During this evaluation, Plaintiff reported
to the examiner that she had begun to confuse yes and no when
speaking.  (R. at 182.)  However, during the evaluation,
Plaintiff "successfully answered general yes/no questions and
followed simple commands."  (R. at 183.)  Additionally, Plaintiff
reported that she sometimes had trouble understanding her
husband, and also had difficulty understanding and responding to
questions.  (R. at 182.)  Plaintiff displayed continued word
finding difficulties and had impairments in all language
modalities.  (R. at 185.)  The examiner provided Plaintiff with a
communication card containing identifying information, emergency
contact information, and an explanation of Primary Progressive
Aphasia.  (R. at 185.)  She further recommended that Plaintiff

pursue speech and language treatment "to focus on developing and stabilizing use of strategies and tools to facilitate functional communication." (R. at 185.)

Plaintiff was re-evaluated at the Northwestern Speech and Language Clinic on June 10 and August 20, 2002. Both reports show that Plaintiff worked hard during her treatment sessions and consistently completed home practice assignments. (R. at 189, 192). During her treatment, Plaintiff developed communication note cards including yes/no, an alphabet board, starter phrases, and verb tenses. (R. at 189.) When asked simple yes/no questions and prompted to match gestures to her verbalized answer, the two forms of communication matched 90% of the time. (R. at 191.) By the end of her second quarter of treatment, Plaintiff was able to reference her communication card with transitional phrases in structured conversation and use her yes/no card with 100% accuracy. (R. at 192.)

IV. ALJ Bretthauer's Decision

On June 23, 2003, the ALJ issued her decision, finding Plaintiff not disabled and denying her claim for benefits. (R. at 22.) While the ALJ found that Plaintiff's impairments of idiopathic progressive aphasia and depression were severe, the medical evidence did not indicate that they were severe enough to meet or equal the requirements of any of the Social Security Listings. (R. at 15.) The ALJ also found that the Plaintiff had

23

not engaged in any substantial gainful activity since the alleged onset of her disability. (R. at 20.)

The ALJ concluded that Plaintiff retained the residual functional capacity ("RFC") to "perform medium work that is simple, repetitive, and routine and does not require general public contact, a need to communicate or even moderate exposure to unprotected heights and hazardous machinery." (R. at 19.) In making this assessment, the ALJ noted that the medical evidence supported a "mild" restriction of Plaintiff's daily living activities and of her ability to maintain social function. (R. at 18.) The ALJ discussed Plaintiff's almost unchanged daily routine, her continuing ability to drive even long distances, and her good exercise habits. (R. at 18.) According to the ALJ, the evidence established that Plaintiff's impairments caused "'moderate' deficiencies of concentration, persistence or pace, but have caused no repeated episodes of decompensaiton." (R. at 18-19.) The ALJ also considered Plaintiff's inability to answer why she could not do unskilled work, such as janitorial work, and noted a lack of evidence in the record supporting greater limitations. (R. at 18.) On the whole, the ALJ found Plaintiff's allegations regarding her limitations to be credible. (R. at 18.)

Based upon this RFC, the ALJ determined that Plaintiff was unable to return to her past relevant work, because of its skill

requirements. (R. at 19.) The ALJ determined that Plaintiff's RFC demonstrates that she is capable of performing a significant range of medium, unskilled work. (R. at 19.) ALJ Bretthauer also considered VE Mendrick's testimony that, given Plaintiff's age, education, past relevant work experience and RFC, Plaintiff was capable of working as a cleaner, hand packager, or assembler. (R. at 20.) According to the VE, there were 22,000 such jobs in the regional economy that Plaintiff could perform. (R. at 20.) Overall, the ALJ determined that the Plaintiff was "capable of making a successful adjustment to work," and, therefore, that Plaintiff was not disabled. (R. at 20.)[2]

The ALJ also discredited Dr. Mesulam's opinion that Plaintiff was unable to work. (R. at 17.) By examining Dr. Mesulam's medical reports, the ALJ determined that his October 23, 2003 opinion that Plaintiff was disabled was inconsistent with his prior findings of "only mild aphasia, with numerous good to excellent cognitive abilities." (R. at 17.) Furthermore, the ALJ determined that Dr. Mesulam's opinion was not supported by the remaining substantial evidence in the record. (R. at 17.) Lastly, because such an opinion is reserved to the Commissioner, the ALJ determined that Dr. Mesulam's opinion "was not entitled

---

[2] Being that Plaintiff was 62 at the time of this decision, the Regulations defined her as "an individual closely approaching retirement age." (R. at 19.)

to any additional weight, and [was] discounted as unsupported."
(R. at 17.)

## **Standard of Review**

In reviewing the ALJ's decision, the Court may not
substitute its own judgment for that of the Commissioner,
reevaluate the facts, or reweigh the evidence. *Herron v.
Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). Where conflicting
evidence allows reasonable minds to differ as to whether a
claimant is disabled, the Commissioner, not the courts, is
responsible for making that decision. *Herr v. Sullivan*, 912 F.2d
178, 181 (7th Cir.1990). Therefore, the Court will uphold the
ALJ's decision if it is based on proper legal criteria and
supported by substantial evidence. *Clifford v. Apfel*, 227 F.3d
863, 869 (7th Cir. 2000); *see also* 42 U.S.C. § 405(g) (Westlaw
2005) ("[T]he findings of the Secretary as to any fact, if
supported by substantial evidence, shall be conclusive"). While
substantial evidence is "more than a mere scintilla" of proof, it
is no more than "such relevant evidence as a reasonable mind
might accept as adequate to support a conclusion," *Richardson v.
Perales*, 402 U.S. 389, 401 (1971). Above all, the Court need not
determine whether the claimant is disabled. *Cass v. Shalala*, 8
F.3d 552, 555 (7th Cir.1993).

The Court's limited power of review does not grant the ALJ
unlimited judicial deference. The ALJ must consider and

minimally articulate an analysis of all relevant, and even conflicting, evidence. *Herron*, 19 F.3d at 333 (*quoting Ray v. Bowen*, 843 F.2d 998, 1002 (7th Cir. 1988)). While failing to articulate reasons for accepting or rejecting entire lines of evidence falls below this minimum level of articulation, *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir.1993), this does not mean that the ALJ must make a written evaluation of each piece of evidence or testimony, *Orlando v. Heckler*, 776 F.2d 209, 213 (7th Cir. 1985). In order for the Court to trace the path of the ALJ's reasoning, *Carlson*, 999 F.2d at 181 (7th Cir.1993), the ALJ "must build an accurate and logical bridge from the evidence to his conclusion," *Clifford*, 227 F.3d at 872.

## Social Security Regulations

Under the Social Security Regulations (the "Regulations"), the ALJ must proceed through a five-step sequential analysis to determine whether a claimant is disabled. 20 C.F.R. § 404.1520 (Westlaw current through July 11, 2005). The ALJ must consider whether the claimant: (1) is currently employed; (2) has a severe impairment or combination of impairments; (3) has an impairment that meets or medically equals any impairment listed in the Regulations as being so severe as to preclude gainful activity; (4) is unable to perform her past work; and (5) is capable of performing work in the national economy. *See* 20 C.F.R. §§ 404.1520 and 416.920; *see also Young v. Sec'y of Health and Human*

*Servs.*, 957 F.2d 386, 389 (7th Cir. 1992). An affirmative answer on steps three and five leads to a finding of disabled. *Clifford*, 227 F.3d at 868. A negative answer on any step, other than step three, leads to a finding of not disabled. *Id.* The burden of proof is on the claimant through step four, then shifts to the Commissioner at step five. *Id.*

Residual functional capacity is what a claimant can still do despite her physical and mental limitations. *Hickman v. Apfel*, 187 F.3d 863, 869 (7th Cir. 1999); 20 C.F.R. § 404.1545(a). The claimant's RFC is used at steps four and five of the sequential analysis to determine her ability to engage in various levels of work (sedentary, light, medium, heavy, or very heavy). 20 C.F.R. § 404.1567. According to the Regulations, and as explained in SSR 96-8p, the ALJ must assess the claimant's work-related abilities on a "function-by-function basis," considering all relevant evidence, including physical, mental, and any other abilities affected by the claimant's impairments. SSR 96-8p; *see* 20 C.F.R. §§ 404.1545 & 416.945; *see also Cass*, 8 F.3d at 555.

Furthermore, while the Commissioner is responsible for developing the claimant's complete medical history, the claimant is responsible for "providing the evidence [the Commissioner] will use to make a finding about [her RFC]." 20 C.F.R. § 404.1545(a)(3). The claimant must "provide evidence showing how [her] impairment(s) affect [her] functioning" and ability to

work. 20 C.F.R. § 404.1512(c). Again, the ALJ's RFC
determination must be supported by substantial evidence in the
record. *Clifford*, 227 F.3d at 869.

## Discussion

Plaintiff argues that the ALJ's decision must be reversed or
remanded, because: (1) the ALJ improperly found that Plaintiff
had the RFC to perform medium work; (2) the ALJ improperly relied
on the VE's testimony as substantial evidence; and (3) the ALJ
improperly discredited Dr. Mesulam's opinion that Plaintiff is
unable to sustain competitive employment on a full-time basis.
The Court considers each argument in turn.

A. ALJ Properly Determined Plaintiff's RFC

Plaintiff proffers several grounds in support of her claim
that the ALJ improperly found that she had the RFC to perform
medium work. First, Plaintiff maintains that, in violation of
SSR 96-8p, the ALJ did not consider Plaintiff's dizziness,
headaches, and equilibrium disturbances when determining her RFC.
Second, Plaintiff claims that the record contains sufficient
evidence to support additional limitations on Plaintiff's RFC.
Third, Plaintiff claims that if she were to perform medium level
work, she would be an industrial hazard. Fourth, Plaintiff
maintains that she would be unable to obtain and subsequently
sustain medium level work, because she would be an unreliable
employee. Finally, Plaintiff argues that the ALJ should have

contacted a medical expert when she determined Plaintiff's RFC. For all of these reasons, Plaintiff claims that the RFC determined by the ALJ was not supported by substantial evidence. The Court disagrees.

## 1. The ALJ Accounted for Plaintiff's Dizziness, Headaches, And Equilibrium Disturbances When Determining Her RFC.

In determining Plaintiff's RFC, the ALJ noted Plaintiff's continuing ability to drive, to perform regular daily activities, and to practice Tai Chi with only some changes in balance. (R. at 205, 217-219, 223.) Plaintiff testified that she experienced dizzy spells only once a week while on the stairs, never actually fell down, and did not get dizzy while driving to Milwaukee. (R. at 216.) Otherwise, Plaintiff testified that she had no trouble walking, standing, or sitting. (R. at 217.) Accordingly, the ALJ limited Plaintiff to medium work that does not require "even moderate exposure to unprotected heights and hazardous machinery." (R. at 19.) These limitations directly correspond to Plaintiff's credible complaints of dizziness while at some elevation (on the stairs) and other minimal balance difficulties.

Additionally, substantial evidence shows that the ALJ adequately assessed Plaintiff's headaches and her need to take naps when formulating her RFC. Plaintiff testified that she develops headaches of unknown onset approximately once a week and needs to take one or two-hour naps to alleviate them. (R. at

214-15.) While finding these complaints credible, the ALJ noted that Plaintiff does not take any medication for her headaches and has never discussed them with a doctor. (R. at 215.) Furthermore, Plaintiff did not include these naps in her list of daily activities or indicate that her activities have changed because of her need to take naps. (R. at 217-19.) Substantial evidence supports the ALJ's conclusion that once weekly headaches, for which she took no medication, did not affect Plaintiff's ability to work and, therefore, the ALJ appropriately accounted for Plaintiff's impairments when determining her RFC.

## 2. Substantial Evidence In The Record Does Not Support Additional Limitations.

Second, Plaintiff claims that the record supports additional limitations, such as an inability to concentrate or focus and an inability to communicate with a supervisor, which would prevent her from performing "simple, repetitive and routine tasks." (R. at 19.) The ALJ concluded that the medical evidence did not support these additional limitations, and the Court agrees.

The record reflects that Plaintiff is able to focus enough to learn and perform simple, repetitive, and routine tasks. In determining her RFC, the ALJ considered Plaintiff's continuing ability to drive long distances, to read, to do crossword puzzles, and to perform her own activities of daily living. (R. at 18.) All of these activities require significant focus, and

Plaintiff did not testify that her ability to perform these activities has significantly changed. The ALJ also noted that Plaintiff's mental impairments caused "moderate" deficiencies of concentration, persistence or pace, but caused no repeated episodes of decompensation. (R. at 18-19.) Additionally, during various evaluations, Plaintiff showed good cooperation, put forth significant effort to complete the requested tasks, and even demonstrated an "average learning curve" on a test of verbal learning. (R. at 117-18, 123, 131.) All of this evidence demonstrates that Plaintiff is not significantly restricted by an inability to focus or concentrate and, therefore, the record does not warrant any additional limitations.

Furthermore, Plaintiff's communication difficulties do not warrant additional limitations. Plaintiff contends that her yes/no confusion difficulties will impair communication with a supervisor. While Plaintiff at times suffers from yes/no confusion, an examination at Northwestern University in June 2002 revealed that when asked simple yes/no questions and prompted to point to yes or no while verbalizing her answer, the gesture and verbal response matched 90% of the time. (R. at 189.) As part of her therapy, Plaintiff also utilized a yes/no communication card and verbalized to match her intent with 100% accuracy. (R. at 189.) This evidence demonstrates that, through the use of these cards, Plaintiff could answer a supervisor's yes/no with a

high level of accuracy and supports the ALJ's conclusion that the medical evidence does not warrant additional limitations. Additionally, the ALJ noted that, while Plaintiff had difficulty answering some questions during the hearing, she was able to answer most of them. (R. at 18.)

Citing to *Young v. Barnhart*, 362 F.3d 995, 1002 (7th Cir. 2004), Plaintiff claims that, while the ALJ limited her from general contact with the public, she did not account for whether Plaintiff could communicate with her supervisors and co-workers and, therefore, the RFC is improper. Plaintiff notes that, in *Young*, the court held that an RFC requiring that the plaintiff have limited contact with the public and coworkers was improper, because it did not account for evidence in the record regarding the plaintiff's difficulty interacting with others, responding to criticism, and taking instruction. *Id.* Contrary to *Young*, the record does not reflect that Plaintiff had significant difficulty interacting or socializing with others, or that she would be unable to take direction for simple tasks from a supervisor. Rather, substantial evidence supports the ALJ's conclusion that Plaintiff's impairments caused only "mild" restriction of her ability to maintain social functioning. (R. at 18.)

Illuminating Plaintiff's ability to communicate and interact with others, the ALJ specifically noted the fact that Plaintiff flew alone to California in September 2002 to visit her mother.

(R. at 18.)  Additionally, both Dr. Di Domenico and Dr. Holmes found that Plaintiff's language skills were "fluent," (R. at 119, 124), and several physicians found that Plaintiff preserved several areas of normal cognition.  (R. at 120, 175.)  Some evaluations noted that Plaintiff's conversational speech was understood well and she displayed good verbal comprehension.  (R. at 131, 178.)  All of this evidence supports the ALJ's determination that the evidence of Plaintiff's communication difficulties did not warrant restricting Plaintiff from contact with a supervisor or coworkers.  While Plaintiff claims that she was found capable of performing medium work simply because she could not verbalize any reason to the contrary, substantial evidence in the record supports that she can perform simple, repetitive, and routine tasks.

Overall, the evidence in the record amply supports the ALJ's conclusion that Plaintiff retains the ability to learn and perform "simple, repetitive and routine tasks."  (R. at 19.)  After their review of the record, the state agency psychologists found that Plaintiff "has the mental capacity to perform simple tasks."  (R. at 156.)  Additionally, they noted that Plaintiff's ability to remember work-like procedures and understand and remember very short and simple instructions was "not significantly limited."  (R. at 154.)  In fact, the SSA physicians found that Plaintiff was only moderately limited in

her ability to understand, remember, and carry out detailed instructions. (R. at 154.)

Notably, Dr. Holmes specifically found that Plaintiff could "perform well-routinized activities." (R. at 125.) Additionally, while Plaintiff's continuing ability to perform her daily activities is not determinative of her ability to work, this evidence only substantiates the ALJ's conclusion that the Plaintiff could perform routine tasks. *Carradine v. Barnhardt*, 360 F.3d 751, 755 (7th Cir. 2004). Because her daily activities have been unaffected by her condition, the ALJ reasonably concluded that Plaintiff retained the ability to perform familiar and routine tasks.

Moreover, Dr. Holmes opined that Plaintiff's difficulties in maintaining focus could be compensated for by "keeping distractions to a minimum and focusing on only one thing at a time." (R. at 125.) Also acknowledging Dr. Di Domenico's finding that Plaintiff would not perform well in varied or "novel" situations, the ALJ limited Plaintiff to repetitive tasks. (R. at 117.) Overall, the ALJ's RFC determination accounted for all of Plaintiff's limitations that were supported by substantial evidence, and the record reflects that she can perform simple, repetitive, and routine tasks.

### 3. Substantial Evidence Supports That Plaintiff Would Not Be An Industrial Hazard

Plaintiff claims that the ALJ's RFC determination is not supported by substantial evidence, because her equilibrium disturbances and dizziness would be potentially hazardous in the jobs the VE recommended. Plaintiff references the DOT, which provides a list of possible duties related to each position the VE recommended, and claims that her impairments are inconsistent with these duties. In support of this assertion, Plaintiff cites to *Defrancesco v. Bowen*, 867 F.2d 1040, 1044 (7th Cir. 1989). In *DeFrancesco*, the ALJ concluded that plaintiff had only a "slightly impaired" use of foot controls, even though he had diminished sensation in his feet and occasionally mixed up the brake and gas pedal while driving. 867 F.2d at 1044. Noting that no responsible employer would hire the plaintiff to do work involving the use of foot controls, the court recognized the "staggering" liability implications if such a person were to injure another employee. *Id.*

*DeFrancesco* can be distinguished from the instant case on two grounds. First, as discussed above, while finding Plaintiff credible, the ALJ did not believe that Plaintiff's dizziness and equilibrium disturbances warranted further limitations. The ALJ remarked that Plaintiff only got dizzy on the stairs, never fell down due to her dizzy spells, was able to drive long distances

without getting dizzy, and did not testify that her dizziness
affected her daily activities. (R. at 18.) Plaintiff was not so
concerned about her dizziness that she felt the need to mention
it to her physicians. This evidence reflects that Plaintiff
would not be an industrial hazard in jobs without "even moderate
exposure to unprotected heights and hazardous machinery." (R. at
19.)

Second, Plaintiff has not directly specified, with
substantial evidence, how her dizziness or equilibrium
disturbances would be hazardous in the occupations recommended by
the VE. If Plaintiff claims that her dizziness requires more
limitations than found by the ALJ, she must specify how the
evidence supports further limitations. See Skarbek v. Barnhart,
390 F.3d 500, 504 (7th Cir. 2004) (holding that the court need
not remand for explicit consideration of plaintiff's obesity
because he "does not specify how his obesity further impaired his
ability to work, but speculates merely that his weight makes it
more difficult to stand and walk"). Mere speculation by
Plaintiff that her dizziness further affects her ability to do
medium work does not compel the ALJ to add more limitations,
particularly when Plaintiff's testimony did not indicate that
that her dizziness or equilibrium disturbances impacted her daily
activities in any way. Id. (holding that ALJ did not err by
failing to mention claimant's obesity, and remand is not

necessary where claimant does not present evidence demonstrating how his obesity would affect his ability to work).

## 4. Substantial Evidence Supports That Plaintiff Would Not Be An Unreliable Employee

Plaintiff claims that she would be an unreliable employee because of her need to take unscheduled naps and her difficulty "understanding even the simplest instructions." (Plaintiff's Memo at 12). As Plaintiff points out, an employer has a legitimate interest in insuring that its employees continue to work at a steady pace. *Rush v. McDonald's Corp.*, 966 F.2d 1104, 1114-15 (7th Cir. 1992) (where former employee was terminated after three days of unexplained absence). However, while an employer can expect that its employees be reliable and prompt, *Id.* at 1115, substantial evidence does not support a finding that Plaintiff would be unreliable.

As discussed above the ALJ reasonably determined that Plaintiff's headaches, for which she took no medication, but, rather, took one-hour naps to alleviate, would not interfere with her ability to sustain work. Plaintiff did not testify that her headaches, and subsequent need to take naps, interfered with her daily activities, which indicates that these symptoms would not prevent her from working. (R. at 217-19.) The ALJ also strongly considered that Plaintiff had not discussed her headaches with a physician and did not take any medication to alleviate her

headaches. (R. at 18.) It is difficult to speculate that Plaintiff is unable to work or will be an unreliable employee, when it is possible that some medication or treatment could readily alleviate her headaches. Certainly, the fact that Plaintiff did not seek medical attention for her headaches is not determinative of her ability to work. *De Francesco v. Bowen*, 867 F.2d 1040, 1044 (7th Cir. 1989) ("Lack of discipline, character, or fortitude in seeking medical treatment is not a defense to a claim for disability benefits"). However, this evidence, along with Plaintiff's testimony and description of her daily activities, which indicated that these symptoms did not inhibit Plaintiff, is substantial evidence supporting the conclusion that Plaintiff would be a reliable and timely employee and could perform medium work.

Furthermore, substantial evidence supports the conclusion that an employer could rely on Plaintiff's ability to understand and follow instructions. During some examinations, Plaintiff required that instructions be repeated, clarified or simplified. (R. at 118.) However, a speech and language evaluation at Northwestern University in April 2002 revealed that Plaintiff was able to follow simple commands. (R. at 183.) What's more, Plaintiff's primary physician, Dr. Campbell, stated that Plaintiff was "capable of understanding and following orders." (R. at 137.) In other examinations, Plaintiff also displayed

average auditory memory for both immediate and delayed recall, and tested within the superior range of immediate recall of non-verbal information (figures). (R. at 123, 174.) Overall, this substantial evidence shows that Plaintiff has the ability to understand, follow, and retain both verbal and non-verbal instructions.

### 5. The ALJ Was Not Required To Consult A Medical Expert

In her fifth assertion, Plaintiff claims that, because the ALJ failed to consult a medical expert ("ME") "to provide an informed basis for determining whether the claimant is disabled," her RFC is not supported by substantial evidence. *Green v. Apfel*, 204 F.3d 780, 781 (7th Cir. 2000) (remanding case and holding that ALJ had "played doctor" by failing to call a medical expert where the record was insufficient to determine the credibility of claimant's complaints of debilitating pain). However, it is not mandatory that an ALJ obtain medical expert testimony. See 20 C.F.R. § 404.1527(f)(2)(iii) (an ALJ "*may* also ask for and consider opinions from medical experts" (emphasis added)). An ALJ need only consult an ME when the evidence in the record is inadequate to determine whether the claimant is disabled. *Skarbek*, 390 F.3d at 504 (holding that ALJ was not required to obtain medical expert testimony where substantial evidence existing in the record supported that the claimant was not disabled); *see also* 20 C.F.R. § 404.1527(c) (ALJ will obtain

additional evidence where the existing evidence in the record is insufficient to decide whether claimant is disabled).

This is not such a case. The record, as presented to the ALJ, contained sufficient evidence to determine whether Plaintiff was disabled, and Plaintiff does not claim that the record lacked evidence, was ambiguous, or was inadequate in any way. Furthermore, the ALJ did not "play doctor" by substituting her own judgment for that of the physicians, or by drawing medical conclusions from insufficient evidence. In this case, the record contained substantial evidence in support of the ALJ's decision that Plaintiff was not disabled and, therefore, she was under no duty to consult an ME.

Overall, in determining Plaintiff's RFC, the ALJ considered all of Plaintiff's impairments that were supported by the evidence in the record. The ALJ found Plaintiff's complaints of dizziness, headaches, and need to take naps credible. Despite these complaints, the ALJ determined that the evidence -- including her physicians' reports, her description of her daily activities, and the SSA consulting physicians' reports -- showed that Plaintiff's maladies could be accommodated and that she could perform medium, unskilled work. Therefore, the Court finds that the ALJ's RFC determination is supported by substantial evidence and that the ALJ did not violate her duty to consult an ME.

B. The ALJ Properly Relied On The VE's Testimony

Plaintiff challenges the ALJ's conclusion that she can perform a significant number of other jobs in the national economy on three grounds. First, Plaintiff claims that the ALJ improperly presented the VE with an incomplete hypothetical, by failing to include all of Plaintiff's work-related impairments -- namely her headaches, dizziness, and need for naps. Second, the Plaintiff claims that, because the ALJ presented an inaccurate RFC to the VE, the ALJ could not rely on the VE's testimony as substantial evidence. Finally, the Plaintiff claims that the occupations presented by the VE were inconsistent with the DOT, and, therefore, the ALJ could not rely on the VE's testimony as substantial evidence.

The testimony of a VE is relevant at step five of the Commissioner's sequential analysis, when the question becomes whether a claimant with a severe impairment has the RFC to do other work. See 20 C.F.R. §§ 416.920(e) & (f), 416.945-416.946. When a claimant has severe nonexertional impairments that limit the range of work she can perform, the ALJ must call upon a VE to testify as to "what work, if any, the claimant is capable of performing." Herron, 19 F.3d at 336-37. A VE can advise whether the claimant's RFC permits him or her to perform a substantial number of occupations in the national economy within the range of work at issue, can identify existing jobs within that RFC, and

can state the incidence of such jobs in the region in which the claimant lives. *DeFrancesco*, 867 F.2d at 1045.

Several rules dictate when an ALJ is entitled to rely on a VE's testimony as substantial evidence. As Plaintiff correctly points out, the hypothetical question that the ALJ poses to the VE must incorporate all of the claimant's limitations that are supported by medical evidence in the record. *Herron*, 19 F.3d at 337; *see also Ehrhart v. Sec'y of Health and Human Servs.*, 969 F.2d 534, 540 (7th Cir. 1992) ("All that is required is that the hypothetical question be supported by the medical evidence in the record."). However, in exceptional circumstances, an ALJ may still regard a VE's testimony as substantial evidence, even when the ALJ omitted some of the claimant's limitations from the hypothetical question. *Ehrhart*, 969 F.2d at 540. When the record reflects that the VE independently learned of the omitted limitations by reviewing the medical reports and documents prior to the hearing, or through questioning at the hearing, the ALJ can presume that the VE accounted for those limitations. *See Ehrhart*, 969 F.2d at 540; *see also Cass*, 8 F.3d at 556.

In this case, the ALJ properly relied on the VE's testimony as substantial evidence in support of her conclusion that Plaintiff was not disabled. Initially, the Court notes that the ALJ properly concluded, based upon Plaintiff's testimony and the medical evidence, that Plaintiff's need to take naps did not

significantly restrict Plaintiff's abilities. VE Mendrick
specifically testified that he had reviewed Plaintiff's
vocational history, and that he was present during the entirety
of Claimant's testimony. (R. at 224-25.) Once presented with
the hypothetical question and Plaintiff's RFC, the VE testified
that such a hypothetical person could perform the jobs of a
cleaner/sweeper, a hand-packer, and an assembler. (R. at 225.)
Finally, the VE stated that all of his testimony was consistent
with the DOT. (R. at 227.)

Because the record reflects that the VE reviewed Plaintiff's
record and listened to all of her testimony at the hearing, the
ALJ did not err by relying on the VE's testimony as substantial
evidence. *See Ehrhart*, 969 F.2d at 540 (even assuming
hypothetical question omitted medical evidence which reflected
plaintiff's impairments, ALJ properly relied on VE's testimony
because VE considered all medical reports and documents and
nothing in record indicated that he was unable to understand
them). Even though the ALJ did not specifically mention
Plaintiff's dizziness, headaches, and need to take naps in the
hypothetical question, she could reasonably have presumed that
the VE considered these limitations.

To further ensure that the VE does not present jobs that the
claimant cannot perform, the ALJ must also tender to the VE an
RFC that is supported by substantial evidence. *See Steele v.*

*Barnhart*, 290 F.3d 936, 942 (7th Cir. 2002). As determined above, the ALJ correctly formulated Plaintiff's RFC and, therefore, the VE's testimony as to the jobs Plaintiff could sustain was not based on erroneous considerations. *See Steele*, 290 F.3d at 942. For this reason, the ALJ was entitled to rely on the VE's testimony as substantial evidence in her decision to deny disability benefits.

Lastly, there is a question in the Seventh Circuit about whether an ALJ is entitled to rely on a VE's testimony even if such testimony seems to contradict the description of the claimant's RFC in the DOT. *Compare Powers v. Apfel*, 207 F.3d 431, 436 (7th Cir. 2000) (holding that an ALJ can rely on expert testimony that seems to conflict with the DOT) *with Young v. Sec'y*, 957 F.2d at 392-94 (remanding case because VE's determination of what jobs claimant could perform did not "jibe" with the job requirements listed in the DOT) *and Tom v. Heckler*, 779 F.2d 1250, 1255-56 (7th Cir. 1985) (remanding case where VE, knowing that plaintiff was restricted to sedentary work, named four jobs that plaintiff could perform that were listed in the DOT as requiring (at minimum) the capacity to perform light work).

The VE testified that Plaintiff could sustain employment as a sweeper-cleaner (DOT #389.683-010), hand packager (DOT #920.587-018), or assembler (DOT #732.684-018). First,

Plaintiff's limitations, that the ALJ determined were supported by substantial evidence, do not conflict with the duties described in the DOT for the sweeper-cleaner position. This job does not expose Plaintiff to unprotected heights, nor any hazardous machinery. While as a cleaner, Plaintiff may be required to drive an industrial vacuum cleaner, Plaintiff testified that she is still able to drive a car, which is (the Court would presume) considerably more onerous to operate. Plaintiff may be required to bend down to collect refuse or scrap, hand sweep areas, or clean using rags and a vacuum cleaner. As Plaintiff testified that she still cleans her home on her own, can lift her own grocery bags, and has no trouble walking or standing, her limitations do not conflict with the duties of a cleaner-sweeper. (R. at 18, 218.) Second, Plaintiff's limitations do not conflict with the duties described in the DOT for the hand packager position. Generally, in this position, Plaintiff would be required to clean, fill, wrap, pack and label packaging containers. While Plaintiff may be required to seal a container with nails or glues, this is not "hazardous" machinery, and she has no physical limitations which would inhibit her ability to perform these duties. Throughout her examinations, Plaintiff's writing generally conveyed meaning well and while it tended to be telegraphic, she made no spelling errors, suggesting that labeling containers or recording

information will not be difficult. (R. at 131, 178.)
Additionally, Plaintiff's ability to name objects was "quite
good." (R. at 181.) Third, Plaintiff's limitations are not
inconsistent with the duties of an assembler. Again, this
position does not expose Plaintiff to unprotected heights or
hazardous machinery. While this position may entail a several
step process, Plaintiff would not be working on multiple tasks at
once, as recommended by Dr. Holmes. (R. at 125.)

Because the Court does not believe that the VE's testimony
was inconsistent with the DOT, the Court need not resolve this
question. Plaintiff's limitations do not inhibit her from
performing the duties, as listed in the DOT, of a sweeper-
cleaner, hand packager, or assembler and, therefore, the ALJ
properly relied on the VE's testimony as substantial evidence
that Plaintiff was not disabled.

C. ALJ Properly Discounted Dr. Mesulam's Opinion

Plaintiff claims that the ALJ failed to follow SSR's 96-2p
and 96-5p in rejecting Dr. Mesulam's opinion, because his opinion
that Plaintiff was unable to sustain competitive employment on a
full-time basis was consistent with the evidence of record.
Additionally, Plaintiff claims that the ALJ should have
recontacted Dr. Mesulam to determine the evidentiary basis for
his opinion.

An ALJ has a duty to weigh conflicting evidence from the medical experts and is entitled to resolve these differences by giving more weight to some opinions and less to others. *See Books v. Chater*, 91 F.3d 972, 979 (7th Cir. 1996); *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004). Generally, more weight is given to the opinion of a treating physician "because of his greater familiarity with the claimant's conditions and circumstances." *Clifford*, 227 F.3d at 870; *See* 20 CFR § 404.1527(d)(2). However, if the treating physician's opinion is not supported by medical evidence, or is inconsistent with substantial evidence in the claimant's record, it is not entitled to controlling weight. *See Smith*, 231 F.3d at 440; *Clifford*, 227 F.3d at 870; 20 C.F.R. § 404.1527(d)(2).

Both internal inconsistencies within a treating physician's medical reports and conflicts with the record as a whole may provide good cause to deny controlling weight to a treating physician's opinion.[3] *Clifford*, 227 F.3d at 870; *Knight v. Chater*, 55 F.3d 309, 313 (7th Cir. 1995); *see also* 20 C.F.R. §

---

[3] The ALJ's power to discount a treating physician's opinion is important, because some personal physicians will "go the extra step" to help their patients obtain disability benefits. *DeFrancesco*, 867 F.2d at 1043. On the other hand, it must be recognized that a physician retained by the SSA may have an "equal and opposite propensity." *Id.* However, as the court in *DeFrancesco* notes, this "is not a good reason to presume, in the event of conflicting evidence, that the patient's own physician is *more* reliable than the medical advisor." 867 F.2d at 1043 (emphasis in original).

404.1527(d)(3) ("Generally, the more consistent an opinion is with the record as a whole the more weight [the Commissioner] will give to that opinion"). In both such instances, the ALJ's decision to discount a treating physician's opinion must be supported by substantial evidence in the record. *Gudgel*, 345 F.3d at 470; *see also Rohan v. Chater*, 98 F.3d 966, 968 (7th Cir.1996) (holding that an ALJ's reasons for discounting a treating physician's opinion must be supported by other medical evidence or authority in the record). The ALJ must adequately articulate her reasoning for deny the treating physician's opinion controlling weight. *Clifford*, 227 F.3d at 871.

Additionally, the Regulations do not require that an ALJ accept the opinion of a treating physician over that of a consulting physician. *Books v. Chater*, 91 F.3d 972, 979 (7th Cir. 1996). In certain circumstances, the ALJ is entitled to give substantial weight to the testimony of a consulting physician. *DeFrancesco*, 867 F.2d at 1043; *see also Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir.2003). However, a contradictory opinion of a non-examining physician does not, by itself, suffice as substantial evidence to discount the treating physician's opinion. *Gudgel*, 345 F.3d at 470. If, as discussed above, the treating physician's opinion is not supported by medical evidence, or is inconsistent with the substantial evidence in the claimant's record, the ALJ will not give the

opinion controlling weight. *Books*, 91 F.3d at 979 (holding that, in light of a striking conflict between two treating physicians' opinions, the ALJ was entitled to view one treating physician's opinions of disability, which were unsupported by any medical evidence, with skepticism). After discounting the treating physician's opinion, the ALJ must resolve the conflicting medical opinions by independently considering the relative merits of the treating and consulting physicians to determine how much weight to give each opinion.[4] *Books*, 91 F.3d at 979 (holding that ALJ was justified in accepting consulting physician's opinion over a treating physician's unsupported opinion, where the consulting physician had examined plaintiff once and his opinion only concerned the plaintiff's condition at the time of this examination and this opinion was supported by substantial evidence).

Dr. Mesulam's October 23, 2002 statement that Plaintiff was disabled was internally inconsistent with his earlier medical reports. Prior to making this statement, Dr. Mesulam made several positive findings concerning Plaintiff's condition. Earlier reports showed that Plaintiff's comprehension was "quite excellent," naming was "surprisingly good, and repetition of

---

[4] Instead, the ALJ will determine the weight to give the opinions on the basis of the following factors: the length, frequency, nature and extent of the treatment relationship; the degree to which the medical signs and laboratory findings support the opinion; the consistency of the opinion with the record as a whole; and the specialization of the physician. *See* 20 C.F.R. § 404.1527(d)(2),(3),(4),&(5).

50

language was without difficulty.  (R. at 131.)  On February 25, 2002, Dr. Mesulam found that Plaintiff was able to understand grammatically complex sentences and noted that her writing conveyed meaning well.  (R. at 178.)  Most telling, on July 24, 2002, Dr. Mesulam noted that Plaintiff's aphasia was "mild."  (R. at 181.)  In addition, Dr. Mesulam offered no explanation for his later opinion that Plaintiff was disabled.  Thus, the Court agrees with the ALJ that, Dr. Mesulam's opinion that Plaintiff was unable to work was out of step with his earlier reports.

Dr. Mesulam's opinion was also inconsistent with substantial evidence in the record that Plaintiff was not disabled.  As discussed above, several physicians reported positive findings with regard to Plaintiff's condition in their reports.  According to both Dr. Di Domenico and Dr. Nancy Johnson, Plaintiff retained some areas of cognitive functioning and would benefit from social interaction.  (R. at 121, 174.)  Additionally, Dr. Holmes opined that Plaintiff would be able to continue working in a manner that did not rely on communication skills or rapid thinking.  (R. at 125.)  While some evidence in the record may strengthen Dr. Mesulam's opinion, substantial evidence supports the ALJ's conclusion that Plaintiff was not disabled.

The ALJ has an additional duty to develop a full and fair record and failure to fulfill this obligation is "good cause" to remand.  *Smith v. Apfel*, 231 F.3d 433, 440 (7th Cir. 2000).

While courts differ on exactly how much evidence the ALJ must gather to fulfill this duty, it is clear that if the ALJ "lacks sufficient evidence to make a decision," she must obtain additional evidence or expert opinions. *Clifford*, 227 F.3d at 873; *see also Smith*, 231 F.3d at 443. Unless the evidence in the record is inadequate to determine whether the claimant is disabled, an ALJ need not recontact medical sources or obtain additional evidence. *Skarbek*, 390 F.3d at 504; *see* 20 C.F.R. 404.1512(e).

SSR 96-05p also charges the ALJ with making "every reasonable effort" to recontact treating sources when they provide opinions on issues reserved to the Commissioner and when the bases for such opinions are not "clear." However, the Ruling later states that the ALJ must determine whether such an opinion is supported by the record and in accordance with 20 C.F.R. § 404.1527(d),[5] determine the appropriate weight to give the

---

[5] Under 20 C.F.R. § 404.1527(d)(2), "if [the ALJ finds] that a treating source's opinion on the issue(s) of the nature and severity of [claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [claimant's] case record, [the ALJ] will give it controlling weight." If the ALJ does not give the treating source's opinion controlling weight, the ALJ looks to the length of the treatment relationship, the nature and extent of the treatment relationship, the supportability of the source's opinion, and other factors when considering how much weight to give the opinion. The ALJ must always give "good reasons in [her] notice of determination or decision for the weight [she] gives claimant's] treating source's opinion."

52

opinion. SSR 96-05p ("[I]t would be appropriate to consider the supportability of the opinion and its consistency with the record as a whole."). It follows, therefore, that if the record contains enough evidence, outside of this particular treating source's opinion, to determine whether the claimant is disabled, clarification is unnecessary and the ALJ need not recontact this physician. *See Skarbek*, 390 F.3d at 504 (holding that where the evidence in the record was adequate for the ALJ to find plaintiff not disabled, the ALJ was not required to recontact a treating physician, even though the ALJ had discounted that physician's opinion as not well-supported by medical evidence).

Lastly, under the Regulations, the ALJ is charged with determining the ultimate issue of disability. 20 C.F.R. § 404.1527(e)(1) ("We are responsible for making the . . . decision about whether you meet the statutory definition of disability"); see also SSR 96-8p ("[W]hether an individual is 'disabled' under the Act is a determination reserved to the Commissioner"). For this reason, a claimant is not entitled to disability benefits simply because a medical source finds that the claimant is "disabled" or "unable to work." *Clifford*, 227 F.3d at 870 (*quoting* 20 C.F.R. § 404.1527(e)(1)). While SSR 96-8p states that opinions from any medical source about issues reserved to the Commissioner must not be ignored, such opinions are never entitled to controlling weight or special significance.

Dr. Mesulam's October 23, 2002 statement that Plaintiff was unable to sustain competitive employment on a full-time basis expressed his opinion that Plaintiff was totally disabled. However, this is a decision reserved for the Commissioner and, in accordance with SSR 96-8p, the ALJ did not assign this opinion controlling weight. Additionally, as required by the Ruling, the ALJ did not ignore Dr. Mesulam's opinion that Plaintiff could no longer work, but rather, she gave specific reasons why such an opinion would not be given controlling weight. (R. at 17.) Furthermore, contrary to Plaintiff's claim, the ALJ had no duty to recontact Dr. Mesulam, because the record contained sufficient evidence for the ALJ to find Plaintiff not disabled.

Because Dr. Mesulam's opinion that Plaintiff was totally disabled was not supported by substantial evidence in the record, was inconsistent with his previous medical reports, and concerned a decision that is reserved to the Commissioner, the ALJ properly declined to give this opinion controlling weight. Furthermore, as Dr. Mesulam's opinion did not deserve controlling weight, the ALJ was entitled to give substantial weight to the SSA consulting physicians' opinions, so long as those opinions were supported by substantial evidence. As substantial evidence in the record supports the ALJ's conclusion that Plaintiff is not disabled, the Court rejects Plaintiff's claim that the ALJ erred by choosing to

believe the opinions of the SSA physicians over Dr. Mesulam's opinion that Plaintiff could not sustain competitive employment.

## Conclusion

In any case such as this, there will always be conflicting medical evidence. However, the Court's review of the ALJ's decision does not concern whether any evidence in the record contradicts that decision, but rather, whether the ALJ's decision was supported by substantial evidence. While the record contains some evidence in the Plaintiff's favor, and the Court is sympathetic to Plaintiff's condition, substantial evidence supports the ALJ's decision that Plaintiff was not entitled to disability benefits. In conclusion, the Court finds that ALJ Bretthauer's decision to deny disability benefits was supported by substantial evidence. Accordingly, the Court must deny Plaintiff's Motion for Summary Judgment and grant the Commissioner's Motion for Summary Judgment.

DATED: September 13, 2005    E N T E R E D:

Arlander Keys
United States Magistrate Judge

55